UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ENCOMPASS ADVISORS, LTD.,         :
                                  :
        Plaintiff,                :
                                  :
        v.                        :    CASE NO. 3:09CV1949(DFM)
                                  :
UNAPEN, INC. et al.,              :
                                  :
        Defendants.               :

## MEMORANDUM OF DECISION

Plaintiff Encompass Advisors, Ltd. brings this diversity action alleging breach of contract, fraud and violation of the Connecticut Unfair Trade Practices Act ("CUTPA") against defendant Unapen, Inc. and its officers David Gemma and Joan Walker.  Unapen brings a counterclaim against plaintiff for breach of contract.  In December 2013, the court held a four-day bench trial.  In February 2014, the parties submitted post-trial briefs.  Having considering the evidence and briefs, the court concludes that plaintiff has failed to prove its claims and that Unapen has proved its counterclaim.

I.   Findings of Fact

Based on the credible testimony, the exhibits and the entire record developed during trial, and pursuant to Fed. R. Civ. P. 52(a), the court finds the following facts.

## Parties

Plaintiff Encompass Advisors, Ltd. is a Registered Investment Advisor located in North Carolina whose president and sole owner is Jon Randolph Green.  Defendant Unapen, Inc. is a Connecticut corporation that designs and manufactures computer software.  Defendant David Gemma is Unapen's Vice President and Secretary.  Defendant Joan Walker is Unapen's chief financial officer and also was its chief operating officer during the relevant period.

## Products

In November 2006, Green was using two computer systems to keep track of his clients and their investment portfolios.  One program was a client management database that included vital profile information such as names, addresses, birthdates, social security numbers, risk tolerance, whether the client permitted trades at the advisor's discretion, etc.  The other program — called Schwab PortfolioCenter — was a portfolio accounting system that calculated the performance of the clients' investments.  Any time Green wanted to know how well a client's portfolio was performing, he had to run multiple reports of various performance measures in PortfolioCenter, locate the relevant data and cobble it together manually.

To increase efficiency, Green was seeking a computer program that could pull data from various places in

PortfolioCenter and collate that data into a single snapshot of
the client's portfolio performance.  He also wanted a client
database that was enhanced with "daily dynamic reporting," which
meant the ability to review day-to-day performance data in a
single interface and to manipulate that interface to view the
data in different ways.  It was uncommon in the industry at that
time for a program to include both client database and
performance reporting functions.  Plaintiff's existing client
database could pull information from PortfolioCenter but only in
a limited fashion.  Unapen sold subscriptions to two proprietary
computer programs that Green believed would answer his needs —
ClientRep Lite and ClientLogix.

The purpose of the ClientRep Lite program was to generate
reports for clients of the investment advisor.  It functioned as
follows.  Once an investment advisor subscribed to ClientRep
Lite, Unapen's programmers would collaborate with the advisor to
decide what data to include in the report and how the report
should appear.  Next, the programmers would "hook up" the data
fields in ClientRep Lite with data fields in PortfolioCenter.
Unapen's proprietary "loader" software would "pull" the relevant
data from PortfolioCenter into ClientRep Lite.  The subscriber
could then print the custom report and mail it to the client.

The purpose of ClientLogix was not to create a static
report to give to clients but to aggregate information on a

3

screen so that the investment advisor could have all aspects of a client relationship — including personal profile, investment performance and notes — at his fingertips.  At its core, ClientLogix was a client database but, in addition, Unapen's loader software could pull performance data from PortfolioCenter and display it in ClientLogix in connection with the client's profile.  ClientLogix was "dynamic" in two senses: it organized the client's data into levels — household, persons in that household, and investment portfolios associated with each person — and it enabled the investment advisor to organize data in "dashboard" views.  In its raw form, ClientLogix had four dashboards — My Day, consulting, sponsor review and regional overview — but others could be added at the subscriber's request.  In its standard form, ClientLogix was programmed to pull daily loads of transactions data and monthly loads of performance data but could be modified to pull performance data on a daily basis.

### Master Agreement and ClientRep Lite

On November 27, 2006, plaintiff and Unapen executed a Master Agreement and Schedule A, which provided that plaintiff would purchase one annual subscription to ClientRep Lite for $2500.  The contract was signed by Jon Randolph Green and defendant David Gemma.  (Pl.'s Ex. 1.)  The parties agreed that to the following provisions:

4

- <u>Scope of Work</u>:  Unapen would perform the scope of work described in Schedule B and any modifications to Schedule B mutually agreed upon in writing.  (<u>Id.</u> at.)

- <u>Payment</u>:  Plaintiff would pay in accordance with the price list and payment terms in the schedules and would reimburse Unapen for all reasonable costs, including reasonable attorney's fees, incurred in collecting past due amounts.  (<u>Id.</u> at § 6.)

- <u>Ownership</u>:  Deliverables, including the Core Database, Database Loaders, Common DLL's, Stored Procedures, User Interface and Reports, would remain "the sole and exclusive property of Unapen."  (<u>Id.</u> at § 5.)

- <u>Warranties</u>:  Unapen warranted that its software would perform in accordance with the "Design Analysis" for 90 days and that the program would perform in accordance with the instructions and user manuals for 90 days after installation.  Unapen expressly disclaimed any implied warranty of fitness for a particular purpose or "that the program's functionality will meet customer's requirements."  (<u>Id.</u> at ¶ 1.8 and § 8.)

- <u>Confidentiality</u>:  The parties would not disclose each other's confidential information except as permitted under the contract.  (<u>Id.</u> at ¶ 4.2.)  "Confidential Information"

included "information whether written, electronic, or oral,
identified as proprietary and not generally available to
the public, designated as "Confidential," "Proprietary" or
with similar marking . . . .  The term includes . . .
visual demonstrations, oral disclosures . . . ."  (Id. at ¶
4.1.)

- Termination:  The contract would continue for two years.
  (Id. at ¶ 7.1.)  A party could terminate the contract
  sooner if the other party failed to cure a default thirty
  days after receiving written notice specifying the nature
  of the default.  (Id. at ¶ 7.2.)

- Procedures upon Termination:  Plaintiff was entitled to use
  the products "during the License Term" but, immediately on
  termination of the Agreement, would "pay all amounts owing
  to UNAPEN, cease all use of the Product, uninstalled from
  each machine, and return to UNAPEN all copies of the
  Product and any other UNAPEN Confidential Information in
  its possession."  (Id. at ¶ 7.3).

- Choice of Law:  The contract would be governed by
  Connecticut law.  (Id. at ¶ 11.5)

- Merger Clause:  The contract superseded all prior
  communications between the parties on the subject and would
  be the "complete and exclusive statement of the agreement
  between the parties relating to this subject."  (Id. at 8.)

6

Representations Regarding ClientLogix

After subscribing to ClientRep Lite in November 2006, Green reviewed Unapen's website and had several conversations with defendant David Gemma regarding ClientLogix.  Defendants made the following representations:

- Unapen "truly know[s]" the investment advisor business. (Pl.'s Ex. 4 at 1.)

- ClientLogix could integrate with Schwab PortfolioCenter and could aggregate key investment information in interactive dashboards.[1]  (Pl.'s Ex. 7, 10.)

- ClientLogix was capable of pulling performance data from PortfolioCenter as often as once a day as long as information was there to be pulled.  (Doc. #133 at 24-25, 43.)

- ClientLogix "provides the flexibility to be fully customized to your needs."[2]  (Pl.'s Ex. 4 at 1.)

---

[1]Subsequently, in April 2007 at the latest, Unapen's website advertised that it could link ClientLogix with Schwab PortfolioCenter using "powerful and proven integration technology."  (Pl.'s Ex. 10 at 2, 12.)  At that time, no registered investment advisor was using ClientLogix version 3.6. (Doc. #134 at 140-41.)  Plaintiff has not established that the advertisement was published prior to the contract, which precludes any finding that Green relied on it when he entered into the contract.

[2]Gemma also testified that, before Green agreed to subscribe to ClientLogix, Gemma asked Green about plaintiff's business needs and documented his answers.  (Doc. #134 at 3-5.)  No such document is in evidence.

- ClientLogix implementation was likely to take three to six months.  (Doc. #133 at 46.)

On January 5, 2007, Gemma emailed to Green an Estimate for the first year of ClientLogix version 3.6 that listed the following:

- $23,390 for first annual licenses and subscription

- $4,000 for installation

- $15,000 to $35,000 to convert data from plaintiff's existing database into ClientLogix

- $10,000 to $20,000 for implementation

- $3500 for training.

The $88,040 upper cost estimate did not include customization costs, which were listed as "TBD" with the caveat that "Diagnostic Analysis" was needed in order to estimate the cost of customization.  (Defs.' Ex. 7.)

On January 16, 2007, plaintiff and Unapen executed Schedules A,[3] B, C and D of the Master Agreement.  (Pl.'s Ex. 2.) The documents were signed by Gemma and Green and provided in relevant part:

- <u>Schedule A</u>:  Plaintiff would receive one annual license to ClientLogix version 3.6 for two users.

---

[3]This was distinct from the Schedule A dated November 26, 2007 that pertained to ClientRep Lite.

- <u>Schedule B</u>:  With preauthorization from plaintiff, Unapen would perform data conversion, document plaintiff's business requirements and procedures, create a Design Analysis and develop software as specified in the Design Analysis if requested and preauthorized by plaintiff.

- <u>Schedule C</u>:  Plaintiff would pay the $10,750 subscription fee immediately, would pay subsequent subscription fees in advance and would pay other invoices in net 30 days. Schedule C set forth estimated service costs identical to the pre-contract Estimate except that it made no mention for customization costs.  It also set forth hourly rates for service.

<u>Implementation</u>

In February 2007, Green called defendant Joan Walker to introduce himself.  (Doc. #134 at 31, 64-65; doc. #141 at 11-15.)  Unapen made preparations to convert data from plaintiff's existing database into ClientLogix but, in March 2007, Green decided to convert the data manually to reduce costs by $15,000 to $35,000.  (Defs.' Ex. 8b at 3, 9; Pl.'s Ex. 2 at 3.) Implementation was stalled because Unapen could not test the link between ClientLogix and PortfolioCenter until plaintiff completed the data conversion in the first week of June 2007. (Defs.' Ex. 8b at 19; doc. #134 at 61-62.)

Circumstantial evidence indicates that, while the data conversion was ongoing, the parties discussed how to customize the program to suit plaintiff's business.  The record does not contain the "Diagnostic Analysis" mentioned in the pre-contract Estimate or the "Design Analysis" mentioned in Schedule B.  Nor does it contain an implementation questionnaire; however, an invoice dated March 9, 2007 indicates that Unapen "[r]eviewed the ClientLOGIX questionnaire."[4]  (Defs.' Ex. 8b at 5.)  Two weeks later, Unapen proposed customizations that would enable ClientLogix to pull performance data on a daily, not monthly, basis.  Plaintiff did not authorize that work.  (Pl.'s Ex. 4 at 6, 9-10.)  Subsequent invoices indicate that Unapen did perform the following services.  In March, Unapen analyzed plaintiff's existing database, and the parties discussed developments regarding household reporting.  (Defs.' Ex. 8b at 7.)  In April 2007, the parties discussed adding and modifying data fields, and Unapen installed and tested ClientLogix on plaintiff's computers.  (Id. at 13-14.)  In May and June 2007, the parties further discussed customization of data fields.  Unapen created a work order and began working on customizations.  Unapen upgraded plaintiff's database to ClientLogix version 3.7 and worked on the loader.  (Pl.'s Ex. 6 at 4-5; Pl.'s Ex. 8 at 15-

_____

[4]Gemma testified that a standard implementation questionnaire is issued to each new ClientLogix customer.  (Doc. #133 at 12-13.)

20.)  In July 2007, the parties discussed further customizations of data fields.  (Pl.'s Ex. 4 at 31.)

On July 18, 2007, Green expressed dissatisfaction that several fields essential to his business were not in the standard version of ClientLogix.  Walker agreed to give plaintiff a $7,543.75 credit as an incentive not to abandon the program and agreed to examine issues identified by plaintiff at no charge.  (Defs.' Ex. 8a at 27, 8b at 31-42.)  In spite of this turn of events, plaintiff subscribed to Unapen's ITComplete Basic Services for general technology monitoring, updates, protection and help desk support on July 27.  (Pl.'s Ex. 3.)

On August 13, 2007, Green emailed Walker to express continued dissatisfaction with ClientLogix.  He believed that ClientLogix could be customized to better suit his business needs but he did not want to wait much longer or pay much more. (Pl.'s Ex. 4 at 21-22.)  As of that date, plaintiff had paid $24,531.25 for ClientLogix.[5]  (Defs.' Ex. 9.)  In a phone conversation, Walker agreed that Unapen would implement several customizations immediately and add other customizations into the next version of ClientLogix, which would be released within the next year.  She observed that Green was in arrears on

---

[5]Leaving aside the $35,000 estimated cost of data conversion, which plaintiff decided to do manually, defendants had predicted costs of $23,040 to $53,040 in the first year, not including "TBD" customization costs.

ClientLogix invoices, and Green agreed to a monthly installment plan.  (Doc. #70 at 191.)

On September 14, 2007, plaintiff made its last payment on a ClientLogix invoice in the amount of $4000.  (Id.)  At that time, ClientLogix was pulling transactions data from PortfolioCenter on a daily basis.  (Defs.' Ex 10 at 8-10; doc. #134 at 92-93.)  On October 22, 2007, Unapen emailed Green seeking payment on outstanding ClientLogix invoices.  (Pl.'s Ex. 4 at 28.)  Plaintiff last ran a load of daily transactions data on October 24, 2007.[6]  (Defs.' Ex. 11 at 24.)

<u>Termination</u>

On January 4, 2008, Green emailed Unapen a list of complaints regarding ClientLogix.  He stated that he had vetted his complaints with third parties in the industry, three of whom were copied on the email.  He added that he had retained counsel to review the contracts.  (Pl.'s Ex. 4 at 31-34.)  On January 24, 2008, Walker replied by letter stating that plaintiff was in breach for failing to make timely payments.  She proposed a compromise but stated that if plaintiff decided to discontinue its use of ClientLogix, it must pay in full the $9,606.25 in

---

[6]ClientLogix was designed to pull transactions data daily and performance data monthly.  Although ClientLogix was pulling transactions data on a daily basis in October 2007, the evidence indicates that monthly performance data last loaded on May 31, 2007.  (Defs.' Ex. 11 at 5.)  This discrepancy was not explained meaningfully.

overdue invoices and $185 in current invoices.  (Pl.'s Ex. 5 at 5-8.)

On January 28, 2008, Green cut off Unapen's access to his server and formally terminated his ITComplete subscription. (Id. at 36.)  As of that date, he owed $9081.25 for ClientLogix, $8275 for ClientRep Lite and $1268.25 for consulting that pertained to both products.[7]  (Defs.' Ex. 9; doc. #134 at 40-56.)

On February 26, 2008, Walker sent a letter memorializing a phone conversation in which she and Green discussed a compromise and Green expressed interest in continuing to use ClientRep Lite.  (Id. at 9-10.)  Walker sent additional letters in March and May 2008 seeking a compromise resolution.  (Id. at 11-14.)

The two-year contract term set forth in ¶ 7.1 of the Master Agreement said the contract expired on November 27, 2008. (Pl.'s Ex. 1 at 4.)  In December 2008, Walker wrote a letter to Green stating that if plaintiff did not accept Unapen's final offer of compromise by December 19, 2008, the agreement between plaintiff and Unapen would be terminated.  (Pl.'s Ex. 5 at 14.)

### Continued Use of ClientRep Lite

Despite his dissatisfaction with ClientLogix, Green generally was satisfied with ClientRep Lite.  (Doc. #142 at 170-71.)  In May 2007, ClientRep Lite was disrupted when plaintiff

---

[7]Defendants called this category "Flex IT."  (Doc. #134 at 48.)

made changes to asset class names in PortfolioCenter.  On that
occasion, Green agreed to pay $5175 for Unapen to make the
necessary fix.  (Pl.'s Ex. 6 at 3.)  He did not pay annual
subscription fees after 2007.  (Defs.' Ex. 9.)  Green continued
to use ClientRep Lite without paying annual subscription fees
until May 2010, when he again disrupted the program by changing
asset class names in PortfolioCenter.  Unapen declined to fix
the program at that time.  (Pl.'s Ex. 4 at 41-42.)[8]  The amount
of the unpaid subscriptions from 2008 to 2010 was $7500.
(Defs.' Ex. 9.)

II.  Conclusions of Law

Plaintiff claims that defendants made fraudulent
representations about the functionality of ClientLogix (Count
One), breached the Master Agreement with respect to ClientLogix
(Count Two), violated CUTPA (Count Three) and breached the
Master Agreement with respect to ClientRep Lite (Count Four).
(Doc. #47.)  Unapen counterclaims that plaintiff breached the
Master Agreement by disclosing confidential information and
failing to pay amounts owing.

A.  Fraud

In Connecticut, the elements of common law fraud are:

---

[8]Defendants also allege that plaintiff continued to use
ClientLogix.  As evidence, they point to a notation in the
program that is dated 6/23/2013.  (Defs.' Ex. 11 at 22.)  The
record does not contain sufficient contextual explanation to
render the evidence meaningful.

14

> (1) a false representation was made as a statement of fact;
> (2) it was untrue and known to be untrue by the party
> making it; (3) it was made to induce the other party to act
> upon it; and (4) the other party did so act upon that false
> representation to his injury. . . .  [T]he party to whom
> the false representation was made [must claim] to have
> relied on that representation and to have suffered harm as
> a result of the reliance.

Sturm v. Harb Development, LLC, 298 Conn. 124, 142 (2010)

(alterations in original).  "Although proof by preponderance of

the evidence is the ordinary civil standard of proof . . ., the

clear and convincing standard is the appropriate standard of

proof in common-law fraud cases."  Goldstar Med. Servs. v. Dep't

of Soc. Servs, 288 Conn. 790, 819 (2008).  "'[The burden] is

sustained if evidence induces in the mind of the trier a

reasonable belief that the facts asserted are highly probably

true, that the probability that they are true or exist is

substantially greater than the probability that they are false

or do not exist.'"  O'Connor v. Larocque, 302 Conn. 562, 572-79

(2011) (citation omitted).

The record in this case does not contain clear and

convincing evidence of fraud.  To begin with, plaintiff has not

established that Green had any contact at all with defendant

Walker prior to executing the ClientLogix agreement in January

2007, so the claim against her must fail.

Turning to the fraud claims against Unapen and Gemma,

plaintiff argues that Unapen's advertisement that it had

15

"powerful and proven integration technology" was false because
no customer had ClientLogix 3.6 in production at the time.
Plaintiff has not established that the advertisement was made
prior to the contract.

Plaintiff also contends that the implementation of
ClientLogix lasted longer and cost more than promised.  There is
no credible evidence that defendants promised that
customizations would be completed by a date certain.  Gemma did
represent that implementation would take three to six months
based on the assumption that Unapen would perform the data
conversion.  Due to Green's decision to do his own data
conversion, testing and implementation was delayed until June
2007, six months after the contract was signed.  As for cost,
leaving aside the data conversion estimate, defendants predicted
costs for ClientLogix of $23,040 to $53,040 in the first year
not including customization.  In total, Unapen billed $39,605.75
for work on ClientLogix, including customizations.[9]  This was in
line with defendants' representations.

Finally, plaintiff contends that Unapen falsely represented
that it knew the registered investment advisor business and
Gemma falsely represented that ClientLogix was capable of
pulling daily performance data.  If Green interpreted these

---

[9]This total includes the $1993.25 billed for Flex IT and
excludes the $29,256.25 billed for ClientRep Lite and $1295
billed for ITComplete.

statements to mean that ClientLogix would suit his business model without customization, it was his own mistake.  He knew that he was asking for functionality that was uncommon at that time, and he had the opportunity to review the raw product in two live demonstrations prior to purchasing it.  In addition, the record indicates that customization was a key selling point of ClientLogix.  Gemma represented that ClientLogix had "the flexibility to be fully customized to your needs."  He sent a cost estimate listing customizations as "TBD" pending diagnostic analysis.  Schedule B of the contract provided that Unapen would document plaintiff's business requirements and procedures, create a Design Analysis for ClientLogix and develop software as specified in the Design Analysis if requested and preauthorized by plaintiff.  It should have come as no surprise that some development would be necessary to adapt ClientLogix to plaintiff's business and that such development would not be provided free of charge.

For the foregoing reasons, plaintiff cannot prevail on its claim of fraud.

B.  Breach of Contract

Turning to the breach of contract claims, "[t]he elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages."  Treglia v. Santa Fuel, Inc., 148

17

Conn. App. 39, 45 (Conn. App. 2014) (quotation marks omitted).
Plaintiff and defendant Unapen agree that they entered a
contract and commenced performance but each claims that the
other breached.

      1.  <u>Plaintiff's Claims (Counts Two and Four)</u>

In Count Two, plaintiff claims that ClientLogix failed to
deliver daily performance reporting as promised.  This claim
turns on the warranty provisions of the Master Agreement.
Unapen warranted that its software would perform in accordance
with the "Design Analysis" for 90 days and that the program
would perform in accordance with the instructions and user
manuals for 90 days after installation.  It expressly disclaimed
any implied warranty of fitness for a particular purpose or
"that the program's functionality will meet customer's
requirements."  Because the record does not include a Design
Analysis, product instructions or user manuals, there is no
evidence that ClientLogix functioned less well than the product
plaintiff was supposed to have received.

In Count Four, plaintiff claims that defendants breached
the contract by failing to repair ClientRep Lite.  The evidence
establishes that plaintiff made changes to asset class names in
PortfolioCenter in May 2007 and May 2010 that disrupted its
integration with ClientRep Lite.  Unapen repaired the disruption
in May 2007 but not in May 2010.  Because the Master Agreement

terminated in 2008, Unapen had no obligation to repair the program in 2010.

   2.  Unapen's Counterclaim

   In its counterclaim, Unapen alleges that plaintiff breached the Master Agreement by disclosing confidential information and failing to pay amounts owing.  There is insufficient evidence to determine whether plaintiff breached the confidentiality provision.  Green admitted to conversations with third parties but Unapen has not proved that those conversations included confidential information under the contract.  But Unapen has proved by a preponderance of the evidence that plaintiff breached the contract by failing to pay for services that Green preauthorized.  Schedule B set forth the scope of services to be provided, and ¶ 3.1 of the Master Agreement provided that modifications to the scope of work must be agreed to in writing.  Schedule C set forth cost estimates and hourly rates and provided that plaintiff would pay invoices in net 30 days.  Plaintiff's payments were in arrears by August 2007.

   Plaintiff also breached the Master Agreement by using ClientRep Lite after the one-year license term expired and by failing to uninstall ClientLogix and ClientRep Lite and return all copies of the products and confidential information to Unapen once the Agreement was terminated.

C.   <u>CUTPA (Count Three)</u>

Plaintiff also claims that defendants violated the Connecticut Unfair Trade Practices Act ("CUTPA").  <u>See</u> Conn. Gen. Stat. § 42-110b(a) ("No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.").  To determine whether a practice violates CUTPA, the state courts apply the three criteria of the "cigarette rule" developed by the Federal Trade Commission:

> (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [(competitors or other businessmen)].

<u>Cheshire Mortgage Serv., Inc. v. Montes</u>, 223 Conn. 80, 105-06 (1992) (alterations in original) (quoting <u>FTC v. Sperry & Hutchinson Co.</u>, 405 U.S. 233, 244 n.5, (1972)).  "All three criteria do not need to be satisfied to support a finding of unfairness.  A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three."  <u>Id.</u>  To prevail, the plaintiff must establish both that the defendant engaged in a prohibited act and that was the proximate cause of the harm to the plaintiff. <u>Priority Sales Mgmt., Inc. v. Carla's Pasta, Inc.</u>,

3:10CV1918(CFD), 2011 WL 3819748, at *3 (D. Conn. Aug. 26, 2011).

Plaintiff alleges that defendants made false or misleading representations that induced it to buy a product that was unsuited to its needs.  The evidence advanced in support of these allegations is insufficient to establish a CUTPA violation.

　　D.  Damages

As the prevailing party on its breach of contract counterclaim, Unapen seeks damages and the return of all copies of its products and confidential information.  In light of the foregoing, Unapen is entitled to damages in the amount of $18,625 for the unpaid invoices[10] and $7500 for unpaid ClientRep Lite subscription fees.  It is also entitled to the reasonable attorney's fees incurred in collecting the amounts owing. Finally, it is entitled to the return of all copies of its products and confidential information in plaintiff's possession.

III. Conclusion

Judgment shall enter in favor of defendants on Counts One through Four and in favor of counterclaim plaintiff Unapen on its counterclaim.  Unapen is awarded $26,125 in damages and the

---

[10]That sum reflects $9081.75 in unpaid ClientLogix invoices, $8275 in unpaid ClientRep Lite invoices and $1268.25 in unpaid Flex IT invoices.  (Defs.' Ex. 9.)

reasonable attorney's fees incurred in collecting the amounts owing.

Plaintiff shall cease all use of Unapen's products, uninstall all copies of the products and return them to Unapen along with any other "Confidential Information" in its possession.  The parties must meet and confer in a good faith effort to reach an agreement regarding the reasonable attorney's fees that Unapen incurred in collecting the unpaid amounts.  If the parties are unable to reach an accord despite their diligent efforts, Unapen may file a fee application for the court's consideration no later than **April 30, 2014.**

This is not a recommended ruling.  The parties have consented to trial before a magistrate judge pursuant to 28 U.S.C. 636(c) and Fed. R. Civ. P. 73.  (Doc. #82.)

SO ORDERED at Hartford, Connecticut this 31st day of March, 2014.

```
_____/s/_____
Donna F. Martinez
United States Magistrate Judge
```